IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: | 8:15-CV-33 |
| TRI-STATE FINANCIAL, LLC, | BANKRUPTCY NO. BK08-83016 |
| Debtor. | ADV. PROC. NO. 10-8052 |
| | **MEMORANDUM** |
| GEORGE ALLISON, et al., | **AND ORDER** |
| Appellants. | |

| | |
|---|---|
| IN THE MATTER OF: | 8:15-CV-38 |
| TRI-STATE FINANCIAL, LLC, | BANKRUPTCY NO. BK08-83016 |
| Debtor. | ADV. PROC. NO. 10-8052 |
| | **MEMORANDUM** |
| RADIO ENGINEERING INDUSTRIES, INC., | **AND ORDER** |
| Appellant. | |

| | |
|---|---|
| IN THE MATTER OF: | 8:15-CV-39 |
| TRI-STATE FINANCIAL, LLC, | BANKRUPTCY NO. BK08-83016 |
| Debtor. | ADV. PROC. NO. 10-8052 |
| | **MEMORANDUM** |
| JOHN HOICH AND DENISE HOICH, | **AND ORDER** |
| Appellants. | |

George Allison, Jr., Frank and Phyllis Cernik, Chris and Amy Daniel, Distefano Family Ltd. Partnership, Timothy Jackes, George Kramer, and Bernie Marquardt (collectively, "Allison"), John and Denise Hoich (the "Hoiches"), and Radio Engineering Industries, Inc. ("REI") (all collectively, "investors") appeal the January 13, 2015, order

and judgment of the bankruptcy court[1] determining $1,190,000[2] in contested funds were property of the Tri-State Financial, LLC ("Tri-State Financial") bankruptcy estate and awarding Trustee Thomas D. Stalnaker ("Stalnaker") certain fees and expenses from the estate.  With jurisdiction under 28 U.S.C. § 158(a)(1), this Court affirms.

## I.      BACKGROUND

On May 23, 2003, Tri-State Ethanol, LLC ("Tri-State Ethanol"), a South Dakota company that owned and operated an ethanol plant in Rosholt, South Dakota, filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of South Dakota.  On June 20, 2003, a group of investors known as "the Omaha Group"—many of whom who are appellants here—formed Tri-State Financial reportedly as a means to support Tri-State Ethanol and fund its bankruptcy case.

James Jandrain ("Jandrain") and Penny Thelen ("Thelen") were primarily responsible for keeping Tri-State Financial's financial records.  Beginning in June 2003, members of the Omaha Group transferred $2,000,000 to a Tri-State Financial account held at First National Bank of Omaha ("First National").  The transfers were recorded as a "2M call" and treated as capital contributions in Tri-State Financial's general ledger. Tri-State Financial then transferred $793,654.42 from the First National account to Tri-State Ethanol and $1,190,000 to one of Tri-State Ethanol's vendors.

In July 2004, Tri-State Ethanol's bankruptcy case was converted from Chapter 11 to Chapter 7 and John S. Lovald ("Lovald") was named trustee.  On January 24, 2005, Tri-State Financial filed a request for allowance of administrative expenses and a proof of claim in Tri-State Ethanol's bankruptcy case seeking to recover the $1,983,654.42 Tri-

---

[1]The Honorable Shon Hastings, United States Bankruptcy Judge for the District of North Dakota, sitting by designation.

[2]Stalnaker reports $291,550 of the $1,190,000 is not in dispute as a result of default judgments and settlements.

2

State Financial transferred for Tri-State Ethanol's benefit. In making the claim, Tri-State Financial indicated the money was an unsecured post-petition loan to a debtor-in-possession. None of the individual members of the Omaha Group filed a proof of claim in the Tri-State Ethanol bankruptcy related to those funds or objected to Tri-State Financial's claim. Lovald opposed Tri-State Financial's request, objected to its claim, and initiated an adversary proceeding.

In February 2005, Lovald sold Tri-State Ethanol's Rosholt ethanol plant at auction. Tri-State Financial purchased the plant and began operating it. Tri-State Financial funded the purchase with additional capital from the Omaha Group and new Tri-State Financial members. Tri-State Financial issued membership units to those contributing capital at that time. After the plant was profitable, Tri-State Financial made an interest payment to the Omaha Group but not the new members.

At a Tri-State Financial investor meeting in April 2005 attended by the Omaha Group and others, members of the Omaha Group "asked why the $2.0M that Omaha loaned to [Tri-State Ethanol] in 2003-2004 was not listed on the investor roster . . . distributed before the meeting." They were told the funds were originally included on the roster because the funds were going to be converted to equity when Tri-State Ethanol's reorganization plan was confirmed. When the plan failed, "the money remained as a loan to [Tri-State Ethanol] and Omaha filed an administrative claim against the [Tri-State Ethanol] estate for $2.0M." Another investor also "reiterated that it should not be on the roster because it" would dilute that investor's interest. After that meeting, Jandrain and Thelen regularly referred to the $2,000,000 as a loan.

In May 2005, Tri-State Financial and Lovald reached a Compromise Agreement ("Compromise Agreement") to treat $793,654.42 of the $1,983,654.42 Tri-State Financial claimed as a first-priority administrative expense and to treat the remaining

$1,190,000 as a subordinated general unsecured claim.  They submitted the agreement to the Tri-State Ethanol bankruptcy court for approval.

On June 7, 2006, Tri-State Financial obtained an $18,000,000 loan from Centris Federal Credit Union ("Centris"), part of which was used to redeem REI's interest in Tri-State Financial.  As a part of the loan, Centris obtained a security interest in all of Tri-State Financial's assets, including Tri-State Financial's right to the payment of money and general intangibles.  In agreeing to redeem its interest, REI reserved its rights to receive ten percent of any payments made to Tri-State Financial with respect to Tri-State Financial's administrative claim in the Tri-State Ethanol bankruptcy.  In 2008, John Hoich similarly retained his right to receive part of any distribution derived from Tri-State Financial's claim when he sold his equity interest.

On June 14, 2006, the Tri-State Ethanol bankruptcy court approved the Compromise Agreement.  Two weeks later, Lovald paid the $793,654.42 administrative expense to Tri-State Financial, which then distributed the funds pro rata to the Omaha Group, including REI.  On August 28, 2006, the investors, with the exception of REI and Denise Hoich, entered into a release of all claims they may have had against Tri-State Financial.  The parties dispute the scope of that release.

On November 21, 2008, Tri-State Financial filed its own petition for Chapter 11 relief in the United States Bankruptcy Court for the District of Nebraska.  After his appointment as trustee in January 2009, Stalnaker negotiated a settlement with Lovald and obtained the remaining $1,190,000 Tri-State Financial claimed.  On December 31, 2009, the Omaha Group, for the first time, notified Stalnaker that the Omaha Group owned the funds and demanded payment.  In 2010, Stalnaker filed an adversary proceeding, seeking a declaration that the funds were property of Tri-State Financial's bankruptcy estate.  Centris agreed the bankruptcy estate owned the funds but asserted they were subject to Centris's superior security interest in Tri-State Financial's assets.  In

4

contrast, the investors claimed the funds were not Tri-State Financial assets, but that Tri-State Financial held them in trust for the Omaha Group.

A two-day trial began October 30, 2012.   On February 13, 2013, the bankruptcy court[3] determined the $1,190,000 was not property of the Tri-State Financial bankruptcy estate.   Relying on witness testimony and Tri-State Financial's written records, the bankruptcy court found Tri-State Financial held only legal title to the funds in either a resulting trust or a constructive trust for the Omaha Group.   The bankruptcy court determined, however, that the Tri-State Financial bankruptcy estate was entitled to be reimbursed from those funds for the attorney fees, costs, and expenses it incurred (1) obtaining the funds from Lovald and (2) prosecuting the adversary proceeding against the investors.   Noting the investors had supported Stalnaker's position that Tri-State Financial had a right to the funds, the bankruptcy court determined the investors should not profit at the expense of the creditors of the estate.   After a hearing to determine the appropriate amount of those fees, costs, and expenses, the bankruptcy court entered judgment awarding the $1,190,000 less the fee award to the investors.

Stalnaker and Centris (collectively, "appellees") appealed to the United States Bankruptcy Appellate Panel for the Eighth Circuit ("BAP").   The investors cross appealed part of the fee award.   Concluding that a decision on the merits would be premature, the BAP remanded the case to allow the bankruptcy court to address the estoppel and release arguments the appellees had made but that the bankruptcy court had not specifically mentioned.   The BAP noted it could interpret the bankruptcy court's silence as an implicit rejection of those arguments but decided to remand the case to let the bankruptcy court consider those issues in the first instance or explain its reasons for rejecting them.

---

[3]The Honorable Timothy J. Mahoney, then United States Bankruptcy Judge for the District of Nebraska.  Judge Mahoney retired on January 31, 2014.

5

While the appeal was pending, Judge Mahoney retired and the Tri-State Financial bankruptcy case was assigned to Judge Hastings. On remand, the bankruptcy court, without further evidence, hearing, or argument, reconsidered its initial ruling and changed course. The bankruptcy court reasoned "it was free to reconsider its original ruling" because the BAP "did not consider or resolve any issues on appeal." On May 22, 2014, the bankruptcy court decided the $1,190,000 was, in fact, property of the bankruptcy estate and was subject to Centris's security interest.[4] The bankruptcy court rejected the investors' argument that they had established an express, resulting, or constructive trust. The bankruptcy court alternatively decided some—but not all—of the investors had executed releases barring their claims. The bankruptcy court did not alter the fee award.

The investors each appealed to the BAP, primarily arguing the bankruptcy court exceeded its authority on remand and failed to follow the law of the case in reconsidering its earlier ruling regarding ownership of the $1,190,000. The BAP rejected those arguments but again remanded the case because the bankruptcy court did not certify its familiarity with the record or give the parties an opportunity to recall witnesses as required by Federal Rule of Civil Procedure 63 and Federal Rule of Bankruptcy Procedure 9028.

On the second remand, REI and the Hoiches originally sought to recall witnesses for further testimony but eventually voluntarily withdrew their requests. On January 13, 2015, the bankruptcy court certified familiarity with the record and again concluded the $1,190,000 was property of the bankruptcy estate, subject to Centris's security interest. The investors again appeal, choosing this Court instead of the BAP. *See* 28 U.S.C. § 158(c)(1)(A). Stalnaker is holding the disputed funds pending the outcome of these proceedings.

---

[4]Based on that finding, the bankruptcy court concluded the appellees' estoppel arguments were moot.

6

## II.     DISCUSSION

### A.     Standards of Review

"When a district court reviews a bankruptcy court's judgment, it acts as an appellate court." *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987); *see also* 28 U.S.C. § 158(a)(1).   The Court "review[s] for clear error the bankruptcy court's factual findings, and . . . review[s] de novo the bankruptcy court's legal conclusions, as well as its conclusions involving mixed questions of law and fact." *DeBold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006).   "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52; *see also In re LeMaire*, 898 F.2d 1346, 1349-50 (8th Cir. 1990).   The Court reviews discretionary decisions for abuse of that discretion.   *See, e.g., Opportunity Fin., LLC v. Kelley*, 822 F.3d 451, 456 (8th Cir. 2016).   A "bankruptcy court abuses its discretion when its decision relies upon a clearly erroneous finding of fact or fails to apply the proper legal standard." *Ritchie Special Credit Invs., Ltd. v. U.S. Tr.*, 620 F.3d 847, 853 (8th Cir. 2010).

For the most part, the investors acknowledge these are the proper standards of appellate review.   But they argue the Court should review Judge Hastings's factual findings de novo because Judge Hastings, unlike Judge Mahoney, "did not see any of the witnesses during live testimony" and "was not able to observe and appreciate the subtleties that are inherent in every human interaction."   The argument is legally unsupported and unavailing.[5]

---

[5]The appellees argue the investors—by choosing not to present live testimony pursuant to Federal Rule of Civil Procedure 63—have forfeited "any and all claims that Judge Hastings should have seen or heard any witnesses to resolve this matter."   The Court finds it unnecessary to resolve this question but notes at least two factors weigh against finding forfeiture here.   First, Rule 63 places reasonable but imprecise limits on a party's ability to recall witnesses.   A strict forfeiture rule would encourage parties to routinely seek to recall witnesses as a precaution and unnecessarily burden the courts.   Second, the appellees objected to the investors' efforts to recall some witnesses, and the

Although the *absence* of "the trial court's opportunity to judge the witnesses' credibility" may be as relevant under Rule 52 as the *existence* of such an opportunity in reviewing the bankruptcy court's factual findings, the text of Rule 52 quoted above and controlling Supreme Court precedent both make clear that "[i]n applying the clearly erroneous standard to the findings of a [trial] court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969)); *accord Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987) (explaining a district court reviewing a bankruptcy court's judgment "may not make its own independent factual findings"). The Court will review the bankruptcy court's factual findings for clear error.

## B.     Law of the Case

In all, the investors raise more than a dozen issues on appeal, most of which involve, at least in part, some variation of the argument that the bankruptcy court failed to follow the law of the case and exceeded the BAP's mandate by reversing Judge Mahoney's ruling that Tri-State Financial held the $1,190,000 in trust for the investor owners.[6]  The law-of-the-case "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983).  The "doctrine prevents relitigation of a settled issue in a case and requires that courts follow decisions made in earlier proceedings to insure uniformity of decisions, protect the expectations of the parties and promote judicial economy." *In re Just Brakes Corp. Sys., Inc.*, 293 F.3d 1069, 1072 (8th Cir. 2002) (quoting *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 784 (8th Cir. 1996)).

---

bankruptcy court, at least arguably, indicated in its December 18, 2014, order that the transcripts and trial recordings it previously considered were sufficient.

[6]It does not appear REI continues to press this issue.  REI included it in its statement of issues but omitted it from its briefs.

"The doctrine applies to decisions made by appellate courts and final decisions made by [trial] courts that have not been appealed." *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 830 (8th Cir. 2008). It "applies as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). "When a case has been decided . . . on appeal and remanded to the [trial] [c]ourt, every question which was before th[e] [appellate] court and disposed of by its decree is finally settled and determined." *Thornton v. Carter*, 109 F.2d 316, 320 (8th Cir. 1940). The trial court must strictly comply with both the letter and spirit of an appellate court's mandate but otherwise retains its discretion on remand. *Id.* ("A mandate is completely controlling as to all matters within its compass, but on remand the trial court is free to pass upon any issue which was not expressly or impliedly disposed of on appeal.").

Describing the law of the case as the "overarching issue" of this appeal, the investors repeatedly complain the bankruptcy court (and the BAP for that matter) failed to evaluate whether Judge Mahoney's initial decision was clearly erroneous and caused manifest injustice. *See Little Earth of the United Tribes, Inc. v. HUD*, 807 F.2d 1433, 1441 (8th Cir. 1986) ("[W]e will reconsider a previously decided issue only if substantially different evidence is subsequently introduced or the decision is clearly erroneous and works manifest injustice."). As the investors see it, absent those findings, the bankruptcy court had to follow Judge Mahoney's decision as the law of the case.

The appellees meet the investors' law-of-the-case argument with one of their own. Taking "strong exception" to the investors' issue statements, the appellees point out that the BAP already considered and expressly rejected the investors' arguments that the bankruptcy court disregarded the law of the case and exceeded the BAP's mandate after the BAP remanded Judge Mahoney's initial ruling for additional explanation. *See In re Tri-State Fin., LLC*, 519 B.R. 759, 765 (B.A.P. 8th Cir. 2014). In particular, the BAP concluded "the bankruptcy court was not bound by its earlier rulings" and was free to

9

reconsider whether the $1,190,000 was property of the bankruptcy estate and whether the fee award was appropriate because the BAP had not addressed those issues nor "adopt[ed] any of the bankruptcy court's rulings." *Id.*   According to the appellees, "the BAP's opinion was not further appealed and is thus law of the case."   The appellees argue this Court is "bound" by "the BAP's resolution of these issues."

In response, the investors attempt to downplay the BAP's conclusions, asserting the BAP "did not reach those issues as it remanded the case under Rule 63."   The investors maintain "this Court is not bound by BAP 'disagreeing' with [the investors'] argument, but should review this entire matter *de novo*, as a matter of law."   The Court agrees with the investors that the Court is not "bound" by the BAP's decision, but the investors' remaining arguments on this issue are unpersuasive.

First, the Court is not "bound" by the BAP's decision under the law-of-the-case doctrine because the BAP's decision did not constitute a final appealable order. Although the BAP—notwithstanding the investors' assertion to the contrary— unambiguously rejected the investors' law-of-the-case and mandate arguments, the BAP remanded the case to the bankruptcy court for further proceedings.   Thus, the investors have not yet had an opportunity to appeal the BAP's rulings on those issues to the Eighth Circuit.   *See* 28 U.S.C. § 158(d)(1) ("The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section."); *In re Farmland Indus., Inc.*, 397 F.3d 647, 650 (8th Cir. 2005) (discussing finality in bankruptcy cases); *In re Design Classics, Inc.*, 788 F.2d 1384, 1386 (8th Cir. 1986) ("Upon expiration of the time allowed for appeal, the judgment or order becomes the law of the case as to the parties.").

Second, the Court is not "bound" by the BAP's decision because, in this context, the "[l]aw of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona*, 460 U.S. at 618.  In other words, the "doctrine is a rule of practice rather than a

command to the courts."[7]   *In re Progressive Farmers Ass'n*, 829 F.2d 651, 655 (8th Cir. 1987).

Though not bound, the Court finds good reasons to defer to the BAP's carefully considered decisions on these issues.   Deferring to the BAP's rulings will encourage comity, ensure uniformity, and promote judicial economy.   *See In re Just Brakes*, 293 F.3d at 1072; 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure* § 4478.4 (2d ed. 2002) (describing the "special deference that arises from comity" between coordinate courts and "the desire to avoid strategic changes of court to reargue lost positions").[8]   It will also "promote[] the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'"   *Christianson*, 486 U.S. at 816 (quoting 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.404[1], p. 118 (1984)).   In contrast, the investors have not demonstrated a compelling reason to disregard the BAP's considered judgment and to allow the investors to relitigate these settled issues in this Court.   *See In re Just Brakes*, 293 F.3d at 1072.

The Court will not consider the investors' myriad arguments that the bankruptcy court failed to follow the law of the case and exceeded its mandate on remand.   The BAP, which was in a better position to evaluate the scope of its mandate, duly considered and rejected those arguments.

---

[7]While not directly on point, the investors also point out the Ninth Circuit has determined "BAP decisions cannot bind the district courts."   *Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir. 1990).   The Eighth Circuit has described the "question whether BAP decisions are binding precedent" as "unsettled."   *Farmland Indus., Inc.*, 397 F.3d at 653.

[8]The risk of strategic court selection is particularly acute in a case like this where there are successive appeals and an appellant can choose to have an appeal heard by the BAP or by the district court.   *See* 28 U.S.C. § 158(c)(1)(A).   "[S]uccessive panels commonly defer to earlier panels" to relieve the "added concern that free reexamination would encourage multiple appeals, undertaken in the sole hope that a second panel will accept arguments that failed to persuade the first panel."   18B Wright et al., *supra*, § 4478.2.

### C.    Trust

Under 11 U.S.C. § 541(a)(1), a debtor's bankruptcy estate generally includes all of the debtor's "legal or equitable interests . . . in property as of the commencement of the case."  "Property in which the debtor holds . . . only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

The investors assert Tri-State Financial had only legal title to the $1,190,000 Stalnaker obtained from Lovald and held the funds in trust for the benefit of the Omaha Group.  Under Nebraska law, which the parties agree applies to this case, a party claiming that disputed funds are held in trust and thus are not property of the estate must prove the existence of a trust by clear and convincing evidence.  *See* Neb. Rev. Stat. § 30-3833; *Brtek v. Cihal*, 515 N.W.2d 628, 639-40 (Neb. 1994).  "Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved."  *Brtek*, 515 N.W.2d at 640.  In deciding the $1,190,000 was property of the Tri-State Financial bankruptcy estate, the bankruptcy court concluded the investors "did not meet their burden of showing the existence of an express, resulting or constructive trust."  The investors challenge that conclusion.

### 1.    Express Trust

In Nebraska, "a trust need not be evidenced by a trust instrument, but the creation of an oral trust and its terms . . . may be established only by clear and convincing evidence."  Neb. Rev. Stat. § 30-3833; *accord Simon v. Simon*, 5 N.W.2d 140, 142 (Neb. 1942).  Relying on this statute and related case law, Allison and the Hoiches fault the bankruptcy court for noting the absence of a trust document.  In their view, "the evidence is legion and uncontroverted that the intent of the Omaha Group was to establish a trust."  In support, Allison and the Hoiches broadly point to "documents, minutes, memos, taxes, and contracts" and the fact that Tri-State Financial did not list "the funds at issue as an

12

asset or liability of [Tri-State Financial] on its tax returns, books, debt schedules, or audit reports."

To the extent Allison and the Hoiches claim the bankruptcy court's decision was based solely on the absence of a written trust instrument, the claim is without merit. The bankruptcy court considered the absence of a trust instrument as part of its broader analysis of the trial testimony and the "memoranda, email messages, and meeting minutes" that the investors contended established an express trust. While Nebraska law may not require a writing to evidence a trust, the absence of a written trust instrument and other supporting documentation is still relevant to determining whether a party has provided clear and convincing evidence they intended to create an express trust. *See*, *e.g.*, *In re Trust Created by Isvik*, 741 N.W.2d 638, 647-48 (Neb. 2007) (analyzing contemporaneous documents in determining intent).

In deciding the investors had not met their burden of proof, the bankruptcy court found the investors had not adduced a trust instrument or any other contemporaneous documentary evidence "suggest[ing] that Tri-State Financial was accepting and holding the money for those who contributed the money." The bankruptcy court aptly noted none of the investors' cited evidence referred to a trust, named Tri-State Financial as trustee, or defined any trust terms. The bankruptcy court's analysis was brief but sound. Allison and the Hoiches have failed to demonstrate the bankruptcy court clearly erred in concluding the investors failed to provide sufficient evidence to prove they intended to create an express trust.

### 2.    Resulting Trust

Relying on the same evidence cited above, the investors next argue the bankruptcy court erred in failing to find Tri-State Financial held the funds in a resulting trust. "A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the

13

inference is rebutted or the beneficial interest is otherwise effectively disposed of." *Holbein v. Holbein*, 30 N.W.2d 899, 905 (Neb. 1948) (quoting Restatement (First) of Trusts § 404, p. 1250).  A resulting trust is "raised by implication of law and presumed always to have been contemplated by the parties, the intention as to which is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance." *Brtek*, 515 N.W.2d at 639.

"Where a transfer of property is made to one person and the whole or a part of the purchase price is paid by another, a resulting trust arises in favor of the person by whom such payment is made although the payment is not made in money."  *Jirka v. Prior*, 243 N.W.2d 754, 759 (Neb. 1976).   The rationale is that "individuals seldom give consideration to receive nothing."  *Superior Hybrids Co. v. Carmichael*, 333 N.W.2d 911, 913-14 (Neb. 1983).

"The court will impose a resulting trust when the circumstances surrounding a conveyance make it clear that the parties intended such a result," *id.* at 913, but will not declare a resulting trust "upon doubtful and uncertain grounds," *Biggerstaff v. Ostrand*, 261 N.W.2d 750, 754 (Neb. 1978) (quoting *Holbein*, 30 N.W.2d at 906).  "Where the alleged trust relationship is just as consistent with that of a gift or loan, courts will not ordinarily impress a resulting trust." *Id.*

Applying these standards, the bankruptcy court concluded the investors did not establish by clear and convincing evidence that they "intended to create a trust when Tri-State Financial was formed."  The bankruptcy court first examined the circumstances present when the investors formed Tri-State Financial and transferred the $2,000,000 to the First National account.  Finding no evidence of any intent to form a trust, the bankruptcy court concluded Tri-State Financial's records and the other documentary evidence from that time instead indicated that the investors and Tri-State Financial

14

treated the transferred funds as capital contributions and that the investors expected to receive equity for their investments.

In particular, the bankruptcy court found it telling that the original fund transfers to Tri-State Financial were recorded as a "2M call" and treated as capital contributions in Tri-State Financial's general ledger.  REI too initially recorded its transfer of funds to Tri-State Financial as an equity investment.  Jandrain and Thelen, who kept Tri-State Financial's books, also regularly referred to the $2,000,000 as capital calls or capital contributions in other documents.  The bankruptcy court reviewed the trial testimony from Jandrain, Thelen, and others attempting to explain the references to capital but was not convinced the transactions were actually intended to create a trust relationship.

As further evidence of the investors' true intent in forming Tri-State Financial, the bankruptcy court noted that when Jandrain applied for a tax identification number for Tri-State Financial, he did not indicate Tri-State Financial was a trustee.  Tri-State Financial's account at First National likewise did not indicate that Tri-State Financial was a trustee or that the money in the account was held in trust, and Tri-State Financial did not distribute interest earned on the account to the Omaha Group as the bankruptcy court expected it would if Tri-State Financial was trustee.  The bankruptcy court also credited testimony from forensic accountant Robert Kirchner that the contributions from the Omaha Group in 2003 were properly characterized as equity investments in Tri-State Financial and that Tri-State Financial's failure to record the contributions in its records and tax documents was evidence of careless bookkeeping, not a trust relationship.

The bankruptcy court found that the investors continued to treat the funds as Tri-State Financial property when Tri-State Ethanol went bankrupt.  Examining emails between Tri-State Financial's managers at that time, the bankruptcy court noted the managers purposefully decided to file a request for administrative expenses and proof of claim in the Tri-State Ethanol bankruptcy in Tri-State Financial's name, not as trustee or

in the investors' names.  Tri-State Financial's proof of claim indicated that Tri-State Financial made a loan to Tri-State Ethanol, with no mention of any trust relationship. None of the investors filed an individual claim to the funds nor objected to Tri-State Financial's claim or request for administrative expenses.

The bankruptcy court also emphasized that while Tri-State Financial's claim was pending in April 2005, members of the Omaha Group participated in a Tri-State Financial investor meeting that included a discussion of the claim and Tri-State Financial's financial records.  At the meeting, some Omaha Group members asked why the $2,000,000 they transferred to Tri-State Financial was not listed as equity.  Jandrain and another investor explained the contributions were not treated as equity as originally planned and recorded because Tri-State Ethanol's reorganization plan was not confirmed and treating the funds as equity at that point would dilute the interests of the new investors.  They further explained that "[w]hen the plan was not approved, the money remained as a loan."

The bankruptcy court concluded the minutes from that meeting showed (1) the Omaha Group intended and expected to treat the contributions as equity and (2) Tri-State Financial's managers did not treat them as equity because the new investors objected, "not because the Omaha Group intended to create a trust."  The bankruptcy court found the objections from the new investors to treating the $2,000,000 as equity also explained why Tri-State Financial began treating the funds as a loan.  For example, in an April 2006 memorandum, Jandrain reiterated that the $2,000,000 the Omaha Group initially transferred to Tri-State Financial was a loan—"not a capital contribution."  The bankruptcy court found it significant that Tri-State Financial's managers referred to a loan but never a trust.

In July 2006, Tri-State Financial disbursed the $793,654.42 received on Tri-State Financial's administrative claim only to the Omaha Group.  When the plant was

16

profitable, Tri-State Financial also made an interest payment to the Omaha Group but not to the other Tri-State Financial investors.  The investors maintained these events and various other differences in treatment between the $2,000,000 and other capital contributions indicated a trust was created.  The bankruptcy court examined the evidence and found Tri-State Financial's actions were more consistent with a debtor/creditor relationship than a trust relationship.

In short, the bankruptcy court found the investors originally intended to receive equity for their investments but failed to preserve their interests by demanding shares or units.  Then, when Tri-State Financial added new investors, those investors objected to treating the initial contributions as equity, so Tri-State Financial and the investors treated the $2,000,000 as a loan, not a trust.  Finding the investors "did not meet their burden of showing that they contemplated a trust arrangement when they transferred funds to Tri-State Financial in 2003 or at anytime [sic] before December 2009, when their attorney asserted" that theory, the bankruptcy court rejected the investors' request to impose a resulting trust.

The investors argue the bankruptcy court's findings are clearly erroneous and its decision unsupported by the evidence.[9]  According to the investors, the bankruptcy court

---

[9]In an attempt to show the bankruptcy court erred in concluding the investors did not intend to form a trust, Allison and the Hoiches direct the Court's attention to the background section of the Eighth Circuit's opinion in the related case of *American Prairie Construction Company v. Hoich*, 594 F.3d 1015, 1018 (8th Cir. 2010).  In summarizing the factual background for that case, the Eighth Circuit stated "a group of investors formed [Tri-State Financial], a shell corporation designed exclusively to provide funding for [Tri-State Ethanol] in an effort to return the ethanol plant to operation."  *Am. Prairie*, 594 F.3d at 1018.  According to Allison and the Hoiches, that "finding precludes any other interpretation other than Tri-State Financial acting as a Trustee for the funds contributed by the members of the Omaha group.  Any other interpretation requires that this court ignore the finding of fact by the Eighth Circuit."  The investors' attempt to impose a binding factual finding on the bankruptcy court is groundless.  Leaving aside the fact that the Eighth Circuit actually said nothing about a trust, the Eighth Circuit, as an appellate court, ordinarily does not make factual findings, and it gave no indication in *American Prairie* that it intended to do so in the background section of that case or that such a "factual finding" would be binding on the trial court in a different case.  In fact, Allison and the Hoiches provide no authority to support their

"point[ed] to isolated incidents as proof of intent" but "fail[ed] to account for the undisputed testimony of four different witnesses, and the fact that on numerous occasions [Tri-State Financial] took actions consistent with that of a Trustee . . . and treated the Funds as if they were held in trust."

As they did in the bankruptcy court, the investors heavily rely on trial testimony from Jandrain, Thelen, and others that the Omaha Group intended that Tri-State Financial would serve as a conduit to loan money to Tri-State Ethanol.  Describing the numerous references to capital calls as "misnomers," the investors contend the evidence on which the bankruptcy court based its decision was rebutted by evidence the investors presented. As the investors see it, the trial testimony and "three distinct instances clearly establish that the Omaha Group intended for [Tri-State Financial] to serve as a mechanism for transferring money from the Omaha Group to [Tri-State Ethanol]."

First, the investors note the full amount of the $793,654.42 administrative claim was distributed to the Omaha Group, even though other members joined Tri-State Financial in 2005.  The investors argue the only reason for Tri-State Financial to distribute the money to the Omaha Group alone and not make any ownership changes was because Tri-State Financial held the money in trust.  The investors also argue there is no reason to treat the $1,190,000 differently than the first distribution.  Second, the investors argue that the fact that REI and John Hoich retained their interests in Tri-State Financial's claim in the Tri-State Ethanol bankruptcy when they sold their equity interests in Tri-State Financial and received part of the first distribution indicates their interests were not equity interests.  Finally, the investors emphasize that when Tri-State Financial received the loan from Centris, it did not list the claim as an asset, receivable, or equity.  The investors maintain these circumstances prove the funds were not Tri-State

---

suggestion that a background fact about an ancillary matter in an appellate opinion in one case is binding on the factfinder as to the central question in a different case. This Court rejects that novel suggestion.

Financial property.  As the investors see it, these events and Tri-State Financial's financial records and tax forms clearly demonstrate the parties intended to create a trust.

The investors' alternative view of the evidence is plausible.  Indeed, their arguments appear to have persuaded Judge Mahoney to rule in the investors' favor.  But the Court is not persuaded that Judge "Mahoney's decision provides the only logical explanation for what transpired when the funds were first transferred."  Nor have the investors shown that the bankruptcy court's factual findings in the January 13, 2015, order are clearly erroneous or that its contrary view of the evidence is unreasonable or unsupported.  *See*, *e.g.*, *Richardson v. Sugg*, 448 F.3d 1046, 1052 (8th Cir. 2006) ("[F]actual finding[s] supported by substantial evidence, as well as a [trial] court's choice between two permissible views of the evidence, are not clearly erroneous.").

The bankruptcy court did not fail to account for the investors' preferred evidence or elevate form over substance as the investors contend.  Rather, the bankruptcy court carefully analyzed the evidence and thoroughly addressed each point the investors raised. The bankruptcy court simply found that—in light of the contradictory evidence in the record—the investors failed to establish by clear and convincing evidence that they intended to create a trust when they initially transferred the funds to Tri-State Financial. That finding was not in error.

The bankruptcy court's findings are supported by substantial evidence and its interpretation of the evidence is at least as plausible as the investors' view.  "If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse."  *Anderson*, 470 U.S. at 573-74.

### D.    Constructive Trust

The investors argue the bankruptcy court erred in failing to impose a constructive trust on the Tri-State Financial estate.  In the investors' view, the bankruptcy court should

have imposed a constructive trust because allowing Tri-State Financial to retain the funds would convert the contested funds into a gift and "would constitute unjust enrichment."

"A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his acquisition or retention of the property would constitute unjust enrichment." *Wait v. Cornette*, 612 N.W.2d 905, 911 (Neb. 2000). When a party obtains "legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property," the Court will impose a constructive trust. *Id.* "In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof." *Id.*

> Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.

*Brtek*, 515 N.W.2d at 639.

The bankruptcy court quoted the standards from *Wait* and *Brtek* with one exception—it omitted the word "generally" when quoting *Brtek*. The investors argue the bankruptcy court "misstated the law by not fully quoting the *Brtek* court, and consequently misapplied the law in its analysis of whether a constructive trust existed." According to the investors, "this Court must review the entire issue anew" because the bankruptcy court did not understand "that a constructive trust c[ould] be imposed absent fraud or misrepresentation." The Court disagrees.

In quoting *Wait*, the bankruptcy court demonstrated its understanding that Nebraska law permitted imposing a constructive trust under circumstances that result in

unjust enrichment—the basis for the investors' constructive-trust claim—not just as a result of fraud, misrepresentation, or undue influence.  Moreover, the bankruptcy court's analysis is entirely consistent with the Nebraska courts' application of these constructive trust principles.  *See*, *e.g.*, *Brtek*, 515 N.W.2d at 639 (focusing on fraud, misrepresentation, and abuse of a confidential relationship); *Pietzyk v. Pietzyk*, No. A-99-688, 2000 WL 1218416, at *9 (Neb. Ct. App. Aug. 29, 2000) (unpublished) (omitting the term "generally" from its recitation of the *Brtek* standard before doing the same). The bankruptcy court did not reversibly err in refusing to impose a constructive trust.

### E.    Remaining Claims

Because the Court concludes the bankruptcy court did not err in concluding the $1,190,000 was property of the bankruptcy estate, subject to Centris's security interest, the Court need not reach the parties' arguments regarding the statute-of-limitation for requesting a resulting trust, estoppel, and release.  The investors' arguments about the propriety of the fee award are moot, and the investors have forfeited any challenge to Judge Mahoney's evidentiary rulings by not timely raising the issue and not presenting any argument.  The investors' remaining arguments are without merit.

## III.    CONCLUSION

The Court defers to the BAP's decision that the bankruptcy court did not exceed the BAP's mandate and did not fail to follow the law of the case.  The Court concludes the bankruptcy court did not err in concluding the investors failed to provide clear and convincing evidence of an express, resulting, or constructive trust.   The bankruptcy court's order and judgment are AFFIRMED.


Dated this 6th day of September, 2016.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
United States District Judge